UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

UNITED STATES OF AMERICA,

- versus -

LUIS RIVERA,

Defendant.

STATEMENT OF REASONS

12-CR-700 (JG)

JOHN GLEESON, United States District Judge:

PRELIMINARY STATEMENT

When a defendant in a federal criminal case "proffers" in the hope of getting a

cooperation agreement but fails to obtain such an agreement and later pleads (or is found) guilty,

does the sentencing judge learn about the incriminating information he disclosed at the proffer

and consider it when imposing the sentence?

This case places the importance of that question in the starkest possible relief. If

the answer is no, Luis Rivera gets sentenced as a fairly run-of-the-mill heroin trafficker with an

advisory Guidelines[1] range of 108-135 months and a five-year mandatory minimum. If the

answer is yes, he gets sentenced as the murdering, kidnapping, justice-obstructing drug kingpin

he admitted he is during his proffer sessions with the government.

The stakes being what they are, the answer to the question ought to be clear. But

in this district, it is anything but. That uncertainty means that even if the ultimate answer is no,

that is, the proffer statements are not conveyed to the sentencing judge, some defendants are

discouraged from even trying to cooperate, which could impair the interests of law enforcement.

And if the ultimate answer is yes, the uncertainty results in potentially dramatic sentencing

---

[1]    I refer to the Federal Sentencing Guidelines as the "Guidelines" and the United States Sentencing
Commission as the "Commission" throughout this memorandum.

consequences without adequate notice to the affected defendants. Thus, clarity is needed so both sides can engage in rational cost-benefit evaluations before such proffers occur and also in the interest of basic fairness.

As discussed below, the answer to the question in this district requires consideration of three things: (1) the existing legal framework, that is, how the law treats proffer statements in the absence of any agreement; (2) how the government's reservation of rights in the standard "proffer agreement" alters that framework by allowing the government to overtly rely on the proffer statements in specified situations; and (3) a "district policy" regarding proffer statements that formalizes the government's belief, which is poorly expressed in an opaque clause in the proffer agreement, that it must at least *notify* the sentencing judge of the proffer statements in every single case, even cases in which it has agreed not to overtly rely on them.

First, I conclude that the relevant legal authorities provide that when a defendant makes incriminating statements in a proffer in the absence of any proffer agreement, those statements must *not* be disclosed to the sentencing judge in the event no cooperation agreement is reached. Reasonable people can disagree over the wisdom of such a rule, and the commentary in the Guidelines Manual that establishes it is needlessly difficult to locate, but the rule has a sound basis in logic and policy. In any event, it is the clear mandate of the applicable law, and I reject the government's argument to the contrary.

Second, the proffer agreement alters that terrain by empowering the government to overtly rely on the proffer statements at sentencing in four situations: (1) when factual assertions made by the defendant at sentencing contradict the proffer statements; (2) when the defendant seeks so-called "safety valve" relief; (3) when the defendant seeks a downward departure under the Guidelines; and (4) when the defendant seeks a downward adjustment based

on an unsuccessful effort to cooperate.  Because of poor lawyering by Rivera's counsel, this authority was triggered in this case.  But the lawyer was removed, his errors were corrected, and the government has withdrawn its claim that it may overtly rely on Rivera's proffer statements at sentencing.

The most challenging part of this case is the third listed consideration: the combination of a district policy and an oddly-worded provision in the standard proffer agreement that is directly related to that policy.  The policy, which was promulgated by the Probation Department, in consultation with the United States Attorney's Office, is entitled "The Treatment of Proffer-Protected Statements."[2]  It ensures that statements made by defendants during cooperation proffers that do not result in cooperation agreements are brought to the attention of the sentencing judge even when the government is prohibited by the proffer agreement from overtly relying on them.  When the policy is invoked, as it was in this case, the government *notifies* the Court of the proffer statements without *relying* on them.  The notification is done off the record, in a hard-copy memorandum delivered to chambers in a sealed envelope by the Probation Department.  The memorandum informs the judge of the incriminating statements made during the proffer and even provides an alternate Guidelines range calculation that includes that incriminating information.  According to the policy, upon receiving the memorandum, the sentencing judge "can review or ignore it as [he or she] sees fit."[3]

The corresponding provision in the standard proffer agreement reads as follows: "The Office will, to the extent it believes it is required by law, notify the Probation Department and the Court in connection with sentencing of any statements made by [the defendant during the

---

[2]    *See* Gov't Letter Br. dated Dec. 1, 2014, at Ex. C (Memorandum re: "The Treatment of Proffer-Protected Statements"), ECF No. 27.

[3]    *Id.*

proffer].  If such notification is made, the Office also will notify the Probation Department and the Court of the Office's agreement *not to offer in* evidence any such statements at sentencing."[4]

The combination of this provision and the related district policy has established a second track to sentencing judges for proffer statements.  Whereas when the first track is employed the prosecutor overtly relies on the statements, they are included in the presentence report, and they are considered in computing the Guidelines range, the second track is a silent "notification" track.  When it is employed, which occurs in every case where the first track is not, the statements are neither included in the presentence report nor considered in determining the Guidelines range; the government never mentions them orally or in writing at the sentencing; and the sentencing judge can consider them or not when fashioning the sentence.

Though it appears to have been promulgated in the best of faith, I conclude that the district policy, which is not disclosed to proffering defendants before they incriminate themselves in proffer sessions, produced a violation of Rivera's rights in this case, and indeed it violates the defendant's rights in every case in which it is invoked.

As for relief, I did the best I could to fashion the sentence I would have imposed had I never been exposed to those proffer statements through either track.  Through new counsel, Rivera agreed to that course, as opposed to a reassignment of the case for sentencing by another judge who would be untainted by the improper disclosure of information.  As a result, on June 19, 2015, I sentenced Rivera principally to a 102-month term of imprisonment.

---

[4]     *Id.* (emphasis added).  As explained in detail *infra*, the fourth proffer agreement that Rivera signed in 2014 changes the phrase "to the extent it believes it is required by law" to "as required by law."

BACKGROUND

A.      *Rivera's Offense*

Rivera was arrested on October 11, 2012 and indicted on November 8, 2012.  His relevant conduct[5] involved selling a total of 5.97 kilograms of heroin to a confidential informant on four separate occasions during the period from June to October 2012.  However, the indictment focused solely on the last transaction, which occurred on the date of Rivera's arrest.  On that occasion, Rivera was placed in custody before transferring 978.7 grams of heroin to the informant.  Thus, he was charged with a single count of possessing heroin with the intent to distribute.  And since the quantity of heroin involved in the only charged transaction came in at slightly under one kilogram, the quantity that triggers the harsh ten-year mandatory minimum,[6] Rivera was charged instead with the five-year mandatory minimum that prosecutors can invoke when drug trafficking offenses involve 100 grams or more of heroin.

The Federal Defenders of New York were assigned to represent Rivera.

B.      *Rivera's Attempt to Cooperate with the Government*

Rivera decided to meet with the government in hopes of obtaining a cooperation agreement.  Successful cooperation with the government results in a "substantial assistance" motion by the prosecutor.  Such motions perform double-duty; they allow a judge to sentence below any applicable mandatory minimum sentence,[7] and they also constitute a basis for a downward departure from the applicable Guidelines range.[8]

---

[5]      As used here, the phrase "relevant conduct" means the conduct used in determining a defendant's sentencing range under the United States Sentencing Guidelines.  *See* U.S.S.G. § 1B1.3.

[6]      For a discussion of the origin, nature, and effects of the drug offense mandatory minimums, *see United States v. Dossie*, 851 F. Supp. 2d 478, 479-81 (E.D.N.Y. 2012).

[7]      *See* 18 U.S.C. § 3553(e).

[8]      *See* U.S.S.G. § 5K1.1.  Though prosecutors are authorized to move only under § 5K1.1, leaving the mandatory minimum in place, *see Melendez v. United States*, 518 U.S. 120, 129 (1996), in this district they virtually never do that.

A defendant who wants to cooperate must first agree to an interview with the prosecutor called a proffer. Prosecutors insist on proffers so they can make informed decisions about whether to offer cooperation agreements to defendants. Among other things, the proffer allows the prosecutor to assess (1) the defendant's version of the crime under investigation; (2) how that version stacks up against the other available evidence; and (3) the defendant's ability to be a useful witness at trial.[9] This latter assessment requires the prosecutor to learn about other criminal conduct of the defendant, including conduct wholly unrelated to the crime under investigation. There are at least two reasons why unrelated criminal conduct is significant. First, such conduct is often relevant to credibility, and thus the prosecutor needs to evaluate how effectively the would-be cooperating witness might be impeached. Second, the standard cooperation agreement in this and many other districts provides that a cooperating defendant's sentence satisfies his criminal liability for all criminal activity disclosed by the defendant before the execution of the agreement. Thus, depending on the other criminal conduct revealed during the proffer, the prosecutor may, and usually does, condition the availability of a cooperation agreement on the defendant pleading guilty to the crimes revealed during the proffer, particularly if they are more serious than the crime or crimes with which the defendant has already been charged.

Rivera and his appointed counsel from the Federal Defenders of New York met with the government three times to proffer. The dates were October 16, October 25, and November 19, 2012.[10] If he had proffered without an agreement with the government, the law would have prohibited any use of his statements at sentencing. That is because under Rule 410

---

[9] *See generally* John Gleeson, *Supervising Criminal Investigations: The Proper Scope of the Supervisory Power of Federal Judges*, 5 J.L. & POL'Y 423, 448-50 (1997).

[10] *See* Gov't Letter Br. at 1. After retaining a different attorney, Rivera met with the government a fourth time, on September 11, 2014, in a final and unsuccessful effort to obtain a cooperation agreement. However, Rivera did not provide any additional information during that meeting. *Id.* at n.1.

of the Federal Rules of Evidence, they are "statement[s] made during plea discussions with an attorney for the prosecuting authority."[11] Strictly speaking, Rule 410 itself would only have prohibited the use of Rivera's proffer statements at trial, but the Guidelines Manual imports that same prohibition into the sentencing phase in circumstances like Rivera's:

> On occasion the defendant will provide incriminating information to the government during plea negotiation sessions before a cooperation agreement has been reached. In the event no agreement is reached, use of such information in a sentencing proceeding is restricted by Rule 11(f) (Admissibility or Inadmissibility of a Plea, Plea Discussions, and Related Statements) of the Federal Rules of Criminal Procedure and Rule 410 (Pleas, Plea Discussions, and Related Statements) of the Rules of Evidence.[12]

Thus, in the absence of an agreement providing otherwise, the foregoing provisions would have prohibited the use of Rivera's proffer statements at his sentencing on the drug trafficking charge he has pled guilty to. The sole exception relevant here is the rule of completeness set forth in Rule 410(b)(1); if Rivera himself misleadingly relied on one or more proffer statements, others could be used by the government to correct the misimpression.

---

[11] Fed. R. Evid. 410 states in full as follows:

(a) Prohibited Uses. In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: (1) a guilty plea that was later withdrawn; (2) a nolo contendere plea; (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

(b) Exceptions. The court may admit a statement described in Rule 410(a)(3) or (4): (1) in any proceeding in which another statement made during the same plea or plea discussions has been introduced, if in fairness the statements ought to be considered together; or (2) in a criminal proceeding for perjury or false statement, if the defendant made the statement under oath, on the record, and with counsel present.

[12] U.S.S.G. § 1B1.8, cmt. n.3 (2014).

The government has the right to alter by contract the otherwise-applicable rules that prohibit the use of such statements.[13]  And it does so with rare exceptions in every case of a defendant who wants to cooperate by requiring the defendant to execute a standard proffer agreement.  Statements made pursuant to such agreements are referred to in the district-wide policy discussed further below as "proffer-protected" statements, suggesting that the standard agreement affords some "protection" to a proffering defendant.  Indeed, there's a popular misconception among defense lawyers that the proffer agreement actually *benefits* a client.[14]  The truth is that such agreements dilute the law's broad protection against the government's use of proffer statements.  Proffering defendants waive that protection and the agreement substitutes in its place a much narrower one.

As for the waiver, the agreements Rivera signed provide as follows:

> . . . .  [T]he provisions of Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 do not apply to any statements made by Client at the Meeting, and Client shall not assert any claim under these or any other provisions of law that such statements or any leads therefrom should be suppressed.[15]

As mentioned above, the government's right to condition a defendant's proffer on such a waiver is clear.[16]

---

[13]  *See United States v. Mezzanatto*, 513 U.S. 196, 209-10 (1995) (enforcing waiver of exclusionary provisions in Fed. R. Evid. 410 and Fed. R. Crim. P. 11(e)(6) that permitted use of statements to cross-examine defendant); *United States v. Velez*, 354 F.3d 190, 194-97 (2d Cir. 2004) (following *Mezzanatto* where waiver permitted use of statements to rebut defendant's arguments at trial).

[14]  *See United States v. Reich*, No. 04-CR-257 (JG), 2005 WL 524553, at *7 (E.D.N.Y. Jan. 27, 2005) (discussing a criminal defense attorney's experience level and noting that "the best evidence of [counsel's] inexperience was his inability to recognize that the absence of a proffer agreement in this case was *good* for Reich, not bad") (emphasis in original).

[15]  Gov't Letter Br., Ex. A ¶ 5.  Exhibit A to the government's Dec. 1, 2014 letter brief contains all of the proffer agreements Rivera signed.  The first three agreements, from Rivera's substantive proffers in 2012, are virtually identical. Citations to "Ex. A" of the government's letter brief refer to the 2012 agreements unless otherwise noted.  As mentioned above, at *supra* note 10, Rivera proffered a fourth time in 2014, but that session did not result in him revealing any additional substantive information.  Substantive changes in the 2014 revision of the agreement are noted below.  The 2014 version remains the standard form of the agreement currently in use.  *See* Tr. (June 2, 2015) at 13-14.

[16]  *See supra* note 13.

But the proffer agreement doesn't leave defendants with *no* protection against the use of the incriminating statements they make in their efforts to obtain a cooperation agreement. Rather, in place of the broad protection it requires the defendant to waive, it installs the following:

> 2.      In any prosecution brought against Client [Rivera] by the Office [the United States Attorney for the Eastern District of New York], except a prosecution for false statements, obstruction of justice, or perjury with respect to acts committed or statements made at or after the Meeting, the Office will not offer in evidence any statements made by Client at the Meeting (A) in its case-in-chief or (B) at sentencing. The Office will, to the extent it believes it is required by law,[17] notify the Probation Department and the Court in connection with sentencing of any [relevant][18] statements made by Client at the Meeting. If such notification is made, the Office also will notify the Probation Department and the Court of the Office's agreement not to offer in evidence any such statements at sentencing.

> 3.      Notwithstanding paragraph (2) above, the Office may use any statements made by Client (A) to obtain leads to other evidence, . . . . (B) as substantive evidence to cross-examine Client . . ., and (C) as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of Client at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing).

> 4.      Notwithstanding any of the foregoing, in the event the Client seeks to qualify for a reduction in sentence under 18 U.S.C. § 3553(f) or Sentencing Guideline §§ 2D1.1(b)(16) or 5C1.2, [or seeks a downward departure under the Sentencing Guidelines or downward adjustment under 18 U.S.C. §3553(a) based on attempted cooperation[19]] paragraphs (2) and (3) will not apply at sentencing to any statements made by Client at the Meeting, and the Court may rely on all statements by Client in sentencing the Client.[20]

---

[17]        In the 2014 agreement (the last agreement in Ex. A), the phrase "to the extent it believes it is required by law," is replaced with "as required by law."

[18]        The bracketed text was added in the 2014 agreement, and it would have no bearing on the outcome here even if it were in effect when Rivera proffered.

[19]        The bracketed text was added in the September 2014 agreement. Again, the alterations would have no bearing on the outcome here even if they were part of Rivera's proffer agreements. Because they are part of the standard agreement currently offered to defendants, I discuss them here.

[20]        Gov't Letter Br., Ex. A at ¶¶ 2-4.

Thus, the government promises in paragraph two not to offer the proffer statements at the sentencing, but that promise is qualified in five ways. Four of the qualifications authorize the government to overtly rely on the statements in specified circumstances: (1) to rebut factual assertions made during the sentencing phase; (2) if he seeks "safety valve" relief, that is, the two-level Guidelines adjustment set forth in U.S.S.G. § 2D1.1(b)(16)[21] and relief from the five-year mandatory minimum under 18 U.S.C. § 3553(f)[22]; (3) if he seeks a downward departure from the Guidelines, that is, a sentence below the advisory range on a ground authorized by the Guidelines Manual; or (4) if he seeks a sentence below the advisory range based on an unsuccessful attempt to cooperate.[23]

The fifth qualification of the government's promise not to disclose Rivera's proffer statements at his sentencing does not authorize the government to overtly rely on the statements. Rather, it allows the government to "*notify* the Probation Department and the Court in connection with sentencing" of the proffer statements "to the extent it believes it is required by law" to do so.[24] In the event such notification is made, the agreement promises to further notify the Probation Department and the Court of the government's agreement "not to offer in evidence any such statements at sentencing."[25]

---

[21] That adjustment has since been renumbered, and is now subsection (b)(17) of § 2D1.1.

[22] Safety valve relief is available only if the defendant satisfies all five of the following requirements: "(1) the defendant does not have more than 1 criminal history point . . . (2) the defendant did not use violence . . . or possess a firearm or other dangerous weapon . . . in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and (5) . . . the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense . . . ." 18 U.S.C. § 3553(f)(1)-(5); *see also* U.S.S.G. § 5C1.2.

[23] Since *United States v. Booker*, 543 U.S. 220 (2005), sentencing judges have had the power to sentence defendants below the applicable range based on efforts to cooperate even in the absence of "substantial assistance" motions. *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007).

[24] Gov't Letter Br., Ex. A ¶ 2.

[25] *Id.*

Though it is not discernable from the text of the proffer agreement, the government acknowledges that proffering defendants' statements are provided to the sentencing judge in every single case in the district. As discussed further below, if the statements do not fall within qualifications one through four above, then, by definition, they fall within qualification five.

Before he proffered, Rivera's relevant conduct consisted of being involved in the distribution of a total of almost six kilograms of heroin over several months in 2012. According to the information available to the government, he had neither an aggravating nor a mitigating role in that conduct. However, during his three proffer sessions, Rivera informed the prosecutor that he had in fact trafficked over a period of several years in a far greater quantity of drugs – about 31 kilograms of heroin and 456 kilograms of cocaine – and that he occupied a leadership role in the business. Rivera also revealed that he had paid a subordinate $10,000 to falsely assume sole responsibility for two kilograms of cocaine after he and Rivera were stopped and arrested. As a result of the bribe, the charges against Rivera were dropped.

Most importantly, Rivera further proffered that he had engaged in violent criminal activity. Specifically, he called an associate and told him that a courier the associate had hired, who they expected had stolen 20 kilograms of heroin, had to pay for the stolen drugs or be killed. The associate then paid another man $1,000 to kill the courier. Rivera also described other acts of violence he had committed to further his drug trafficking business. These included the kidnapping of another drug dealer's mother, and the kidnapping and torture of that drug dealer himself, as well as other beatings and robberies.

The government ultimately decided not to offer Rivera a cooperation agreement. The prosecutor said that the fact Rivera had been involved in a murder and other violence played

a role in that decision.[26] He also said that that information, which was revealed during the third and last substantive proffer, "was a surprise both to [the Federal Defenders of New York] and certainly to us."[27]

C.     *The Guilty Plea*

After the three proffer sessions concluded without a cooperation agreement having been reached, Attorney Andres Aranda was retained by the defendant's wife. He first appeared on Rivera's behalf on April 3, 2013. Rivera pled guilty to the only charge against him on January 6, 2014. The plea was pursuant to a standard, written non-cooperation agreement.[28] Paragraph 7 of that agreement incorporated and maintained the promises made to Rivera in the proffer agreement regarding the use of his proffer statements:

> *Apart from any written proffer agreement(s)*, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. *Apart from any written proffer agreements*, if applicable, this agreement supersedes all prior promises, agreements or conditions between the parties . . . .[29]

D.     *The Probation Department's Dual Submissions to the Court on April 9, 2014*

The Probation Department provided two separate documents related to Rivera's sentencing to the Court and counsel. Both were dated April 9, 2014. One was the Presentence Investigation Report, referred to here as the "presentence report." The other was a sealed memorandum from the probation officer setting forth Rivera's incriminating proffer statements, and it included an alternate calculation of the applicable Guidelines range.

---

[26]     Tr. (Jan. 30, 2015) at 6.

[27]     Tr. (July 11, 2014) at 16. That fact is significant, as Rivera's very able defense counsel at the time could easily have avoided the issue before me now had she known about Rivera's violent past. Specifically, she could have asked the prosecutor beforehand whether a cooperation agreement would be withheld if Rivera's proffer included crimes of violence.

[28]     Gov't Letter Br. at 2, Ex. B (Plea Agreement).

[29]     *Id.* at Ex. B ¶ 7 (emphasis added).

1.    *The Presentence Report*

A presentence report is the centerpiece of the official record of a sentencing. Required by Rule 32 of the Federal Rules of Criminal Procedure, it sets forth wide-ranging information about the offense, the defendant's criminal history, and the personal history and characteristics of the defendant. Since all of that information may properly be considered by the sentencing judge in fashioning an appropriate sentence,[30] both the government and the defendant have the right to object to the contents of the presentence report.[31] When such objections are made, the sentencing judge is obligated to rule on them, either by resolving the disputed facts or by determining that the matter in dispute will not affect the sentence.[32]

The significance of the presentence report does not end at the sentencing. Rather, the final version of the report accompanies the defendant into the Bureau of Prisons if he is sentenced to prison, where it plays an important role in the defendant's designation to a correctional facility and in his eligibility for certain programs.[33] All presentence reports must also be forwarded to the Commission, allowing it to collect and disseminate important data

---

[30]    *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

[31]    Fed. R. Crim. P. 32(f).

[32]    Fed. R. Crim. P. 32(i)(3)(B).

[33]    *See, e.g.*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts, *The Pretrial Investigation Report* (March 2006) at I-2, *available at* http://www.fd.org/docs/select-topics---sentencing/the-presentence-investigation-report.pdf?sfvrsn=4 ("The presentence report will follow the defendant through his or her contacts in the federal criminal justice system."); Stephen A. Fennell & William N. Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts*, 93 HARV. L. REV. 1615, 1615-17 (1980) (calling the presentence report "the most important document in the federal criminal process" since it "serve[s] as the basic information source during the defendant's journey through the correctional process").

regarding federal sentencing practices.[34]  Finally, the presentence report is the basic document on which a supervision plan is built when a defendant is on probation or supervised release.[35]

The "Offense Conduct" portion of Rivera's presentence report described only his participation in a total of just under six kilograms of heroin on four occasions in 2012.  The report stated that Rivera's advisory Guidelines range was 108-135 months.[36]  The report made no mention of the fact that Rivera had even proffered, let alone made incriminating statements to the prosecutor about other crimes in an unsuccessful effort to become a cooperating witness. And in its final paragraph, the report stated that there were no factors that warrant a sentence "outside of the advisory Guidelines system."[37]

The reason Rivera's proffer statements were unmentioned in the presentence report was he had done nothing to trigger the government's right under the proffer agreement to overtly rely on those statements.  Specifically, he hadn't made any statements that contradicted his proffer statements and he had not moved for safety valve relief, a downward departure, or a downward variance based on unsuccessful cooperation.  Thus, he was still protected by the government's promise not to offer his proffer statements at sentencing.

In the government's view, however, its promise not to *overtly* rely on Rivera's proffer statements in its communications with the Court did not preclude it from *notifying* me of the proffer statements through the Probation Department.  That accounted for the second of the two April 9, 2014 submissions from the Probation Department.

---

[34]     *See* 28 U.S.C. § 994(w)(1)(E) (requiring the Chief Judge of each district to "ensure that, within 30 days following entry of judgment in every criminal case, the sentencing court submits to the Commission . . . a written report of the sentence," including the presentence report).

[35]     *See* Fennell & Hall, *supra* note 33, at 1628 (discussing importance of presentence report to determine appropriate level of supervision).

[36]     The range at the time was actually 135-168 months, but the intervening "Drugs Minus Two" amendment lowered most drug offense Guidelines ranges by two levels.  *See* Amendment 782 to 18 U.S.C. § 3582(c)(2) (July 18, 2014).  The result for Rivera was a range of 108-135 months, and I used that advisory range when I sentenced him.

[37]     Presentence report ¶ 84.

14

2.    *The Sealed Report of Rivera's "Proffer-Protected" Statements*

On the same day that he completed and disseminated the presentence report, the probation officer provided to my chambers, in a sealed envelope, a memorandum detailing the incriminating statements made by Rivera during his proffer sessions. Copies were also sent to counsel. The memorandum stated that it was submitted to me "[p]ursuant to the district policy regarding proffer statements." The government has attached a copy of that policy to its December 1, 2014 letter brief. Under the seal of the Probation Department, the single-page policy, set forth in an August 13, 2013 memorandum from a Deputy Chief Probation Officer to all the judges of our court, reads in full as follows:

> Re:    ***The Treatment of Proffer-Protected Statements***
>
> As a product of discussions with the U.S. Attorney's Office, and the approval of Chief Judge Amon, the Probation Department has amended our policy for handling proffer-protected statements made by defendants that affect the application of the Sentencing Guidelines or serve as a reason for a variance/departure from the Sentencing Guidelines. Specifically, these proffer-protected statements will be excluded from presentence reports. Instead, these statements will be provided to the Court in separate memoranda, in envelopes marked or a cover sheet titled "Proffer-Protected Statements." The memoranda will also note the impact of the proffer-protected statements on the calculation of the Sentencing Guidelines, as well any factors that may warrant a departure/variance from the guidelines. Copies of these memoranda will be provided to the Government and Defense.
>
> The Probation Department believes this will accomplish a number of objectives as follows:
>
> (1) it would keep the presentence reports free of references to cooperation;
> (2) it would provide the Court with a presentence report that does not need to be amended to excise the proffer-protected statements;
> (3) it would provide the Court with a document containing a Sentencing Guidelines recalculation that could be swiftly employed to amend the presentence report if for some reason the proffer-protected statements will be entered into evidence; and

(4) the proffer-protected statements would be included in a separate document which judges can review or ignore as they see fit.

Please contact the above-signed … if you have any questions.[38]

As mentioned, the April 9, 2014 sealed memorandum to me stated that "the Government provided proffer statements" to the probation officer pursuant to that policy. In three single-spaced pages, it then set forth in detail the additional drug trafficking, obstruction of justice, and crimes of violence, including murder, kidnapping, and torture, that Rivera had admitted to during his proffers. That was followed by an alternate Guidelines range computation, one that held Rivera accountable for that conduct. Those admissions raised his base offense level and resulted in upward adjustments for the use of a firearm, the use of violence, occupying a leadership role, and obstructing justice. The resulting offense level was literally off the chart, and the advisory Guidelines range was thus life in prison, although the memorandum further noted that I was constrained by a statutory maximum sentence of 40 years' imprisonment.

Unlike the presentence report, the sealed submission setting forth Rivera's proffer statements triggered no procedural rights. The policy pursuant to which the memorandum was created and forwarded to me creates a track for sentencing information that runs parallel to the track occupied by the presentence report, but it affords Rivera no opportunity to challenge the government's version of his proffer statements. If such objections had been made, the policy does not require the sentencing judge to rule on them. Finally, the policy allows sentencing judges to "review or ignore" the proffer statements "as they see fit," but it says nothing about telling the defendant which of those dramatically different courses the judge has chosen. Thus, a defendant who wishes to object to (or explain, or provide mitigating facts with respect to) the

---

[38] Gov't Letter Br., Ex. C.

government's version of the incriminating proffer statements must consider the risk that the objection itself would result in informing the sentencing judge for the first time that the statements were made.

Though the April 9, 2014 memorandum was forwarded to my chambers pursuant to the above-mentioned policy, it escaped my attention at the time. I have no doubt the fault is mine, but I also note that one problem with a second, off-the-record track for sentencing information is an increased risk that such information can fall through the cracks. In any event, I did not learn of the memorandum or of Rivera's proffer statements until July 9, two days before he was scheduled to be sentenced.

E.    *Retained Counsel's Sentencing Submission*

On May 26, 2014, Aranda submitted a letter in advance of Rivera's sentencing. It included a request for safety valve relief from the five-year mandatory minimum sentence. Despite his awareness of Rivera's proffer statements, Aranda asserted that Rivera was eligible for safety valve relief because, *inter alia*, he "had never been in trouble before and had no previous involvement with the criminal justice system."[39]  Aranda further asked me to "see Mr. Rivera as not only a first time offender; but as an offender that got involved out of necessity."[40] He urged me to sentence Rivera to a 36-month term of imprisonment.[41]

The request for safety valve relief was stillborn, and counsel should have known as much. The terms of the proffer agreement explicitly authorized the government to rely on Rivera's proffer statements if he sought safety valve relief, and those statements flatly disqualified Rivera from such relief for at least five independent reasons. Specifically, his

---

[39]    Rivera Sentencing Letter (May 26, 2014) at 3.
[40]    *Id.*
[41]    *Id.* at 6.

offense involved (1) the use of a firearm; (2) the use of violence; (3) the death of a courier; (4) serious bodily injury to a rival drug dealer; and (5) Rivera's leadership role.[42]

The denial of the request for safety valve relief was the least of the problems created by Aranda's frivolous motion. The motion itself, as well as the misleading statements in the sentencing submission,[43] triggered the government's contractual right under the proffer agreement to overtly rely on the proffer statements at sentencing.

F.    *The Government's Dual Submissions to the Court on July 9, 2014*

The government submitted two letters on July 9, 2014, in advance of Rivera's scheduled July 11 sentencing, one of which was sealed.[44] The publicly-filed letter did not reference the proffer statements but noted that the requested sentence was explained "in a separate submission filed under seal."[45] The sealed submission briefly summarized the information provided to the government in the proffer sessions. It specifically referenced the Probation Department's April 9, 2014 memorandum, of which I was unaware at the time, but made no reference to the district policy. I learned for the first time from that letter that Rivera had admitted in proffer statements to being a much more significant drug trafficker than the presentence report suggested, and that he had engaged in acts of violence (including murder and kidnapping). The prosecutor stated that because Rivera had sought the benefit of the safety valve, "the proffer protections do not apply and the government and the Court may rely on all the

---

[42]    *See supra* note 22 for the requirements for safety valve relief. The fact that Rivera's offense *of conviction* involved none of those facts is irrelevant, as the safety valve provision makes it clear that I must consider all of Rivera's relevant conduct in determining his eligibility for safety valve relief. U.S.S.G. § 5C1.2, cmt. n.3. All of the conduct divulged during Rivera's proffers was part of the same course of conduct of drug trafficking and thus is properly considered relevant conduct, *see* § 1B1.3(a)(2), and Rivera does not contend otherwise.

[43]    Even without the request for safety valve relief, Aranda's assertions that Rivera had not been in trouble before and that the public "does not need any protection from him" would trigger paragraph three of the proffer agreement, which allowed the government to use Rivera's statements during the proffers to rebut any factual assertion made by Rivera, including at sentencing. *See* May 26, 2014 Letter at 5; Gov't Letter Br., Ex. A ¶ 3.

[44]    *See* Gov't Sentencing Letters dated July 9, 2014, ECF Nos. 23 & 24 (sealed).

[45]    Gov't Sentencing Letter, ECF No. 23, at 1. The purpose for filing it under seal was laudable: to protect Rivera from retaliation based on his intent to cooperate. As the fact of his cooperation has since been discussed in multiple public filings and court proceedings, there is no longer any justification for such sealing.

defendant's statements at sentencing."[46]  As a result, the government contended, Rivera's Guidelines range was no longer 108-135 months; it was life in prison.

G.       *The July 11, 2014 Sentencing Proceeding*

The parties appeared for sentencing on July 11, 2014.  In the two days since receiving the government's July 9 letters, I had located a copy of the probation officer's April 9, 2014 memorandum setting forth Rivera's proffer statements.  However, I was still unaware of the district policy regarding proffer statements, and the transcript reflects my belief that, but for the misguided application for safety valve relief, the proffer statements would never have come to my attention.  Thus, I was concerned that Rivera might have received ineffective assistance of counsel.  In response to my stated understanding, the prosecutor, alluding to the district policy, informed me for the first time of the nuanced (and in my view incorrect) approach to proffer statements that the government continues to advance.  Specifically, the prosecutor said that Rivera's sentencing submission merely triggered the provisions in the proffer agreement that authorized the government to overtly rely on the proffer statements; the government had previously been allowed to notify me of the statements, and I had been permitted to rely on them at sentencing all along:

> The Court:  I think this is the case, but I'm saying this so that you can tell me if I'm wrong.  I think it's the case, in light of the agreement pursuant to which the proffers were made, that but for [Aranda's] application for a safety valve adjustment, it might have been the case that [the proffer statements] would never have been brought to my attention.  Do you agree with that …?
>
> The Prosecutor:  I don't agree that it would never have been brought to your attention, but it is the case that the government wouldn't have relied on it in any way, or endorsed or adopted the second guidelines calculation that arose from those statements.  I believe it's our policy that the court is made aware of statements

---

[46]       *Id.* at 1-2.

like this where they go significantly beyond the contours of the charged offense, but that's for you to do with as you think.[47]

The parties informed me during that proceeding that there was still a chance Rivera might enter into a cooperation agreement. If he did, that would moot the issue I had raised, as cooperation agreements provide that the defendant's sentence satisfies his criminal liability for all crimes disclosed to the government prior to the execution of the agreement. Indeed, if Rivera had obtained a cooperation agreement, there is little doubt that the government would have required him to plead guilty to the murder and other crimes of violence he had admitted to in his proffers. In any event, since the sentence imposed after a cooperation agreement would extinguish Rivera's criminal exposure for the crimes of violence, it would obviously be necessary for me to be aware of those activities. Accordingly, at the parties' request, I adjourned the sentence for three months to give Rivera another chance to obtain a cooperation agreement. I instructed the parties that if a cooperation agreement was not reached, they were to let me know by September 26, 2014 what their positions were with regard to whether I should consider Rivera's proffer statements at his sentencing.

H.      *The Parties' Joint Submission on September 26, 2014*

Rivera had one more proffer, on September 11, 2014, but he neither made any more statements to the government about his past criminal activity nor reached a cooperation agreement.[48] In a joint submission on September 26, 2014, Rivera withdrew the portions of the May 26, 2014 sentencing submission that triggered the government's overt reliance on the proffer protected statements. Specifically, Aranda withdrew his request for safety valve relief and his assertions that Rivera had generally lived a law-abiding life.[49] In light of that, the

---

[47]     Tr. (July 11, 2014) at 4-5.
[48]     *See* Gov't Letter Br. at 1, n.1.
[49]     Joint Submission dated Sept. 26, 2014, at 2, ECF No. 25.

government in turn withdrew "for purposes of sentencing its references to and reliance on the defendant's proffer protected statements." [50] It accordingly withdrew its assertion that Rivera's Guidelines range was life, and it urged me to return to the range contained in the presentence report.

In other words, the joint submission sought to return Rivera to the position he had been in before his retained counsel triggered the government's right under the proffer agreement to rely on the proffer statements. However, the parties agreed that even in that circumstance, I was permitted to know about and rely at sentencing upon the incriminating statements made during the proffer sessions: "[I]t is the policy of the United States Attorney's Office to provide the sentencing court, through the Probation Department, with a summary of relevant statements made by the defendant during proffer meetings . . ."[51] This policy, the joint letter asserted, was consistent with U.S.S.G. § 1B1.8[52] and 18 U.S.C. § 3661.[53] "Taken together," the joint submission concluded, "these provisions limit the *admissibility* at sentencing of statements made by a defendant during plea discussions, but they do not limit the government's authority to provide the Court with the substance of those statements."[54]

---

[50]     *Id.*

[51]     *Id.* at 3.

[52]     U.S.S.G. § 1B1.8 provides in relevant part as follows:

> (a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

> (b) The provisions of subsection (a) shall not be applied to restrict the use of information: . . . (5) in determining whether, or to what extent, a downward departure from the guidelines is warranted pursuant to a government motion under §5K1.1 (Substantial Assistance to Authorities).

[53]     *See supra* note 30.

[54]     Joint Submission at 3 (emphasis added).

I.        *The Reappointment of the Federal Defenders of New York*

At the next court appearance on October 28, 2014, I explained to Rivera and Aranda that I wanted counsel who was not afflicted by the specter of having rendered ineffective assistance of counsel to represent him for sentencing. I therefore reappointed the Federal Defenders of New York to represent him and asked the parties to brief anew the question of whether I ought to consider Rivera's proffer statements in determining an appropriate sentence for him.

The government's December 1, 2014 submission contains three main arguments in support of its view that I may properly consider Rivera's proffer statements at sentencing. First, it contends that, as a general matter and even in the absence of any proffer agreement or cooperation agreement, federal law *requires* that I be informed of the proffer statements in sentencing Rivera, and indeed any promise to keep that information from me would be unenforceable because it would be contrary to public policy. The authority cited for the first of those propositions was 18 U.S.C. § 3661; for the second, it was principally *United States v. Williamsburg Check Cashing Corp.*, 905 F.2d 25 (2d Cir. 1990), and *United States v. Fagge*, 101 F.3d 232 (2d Cir. 1996). The government's letter asserts that the district policy regarding proffer-protected statements is consistent with these authorities.[55] A copy of the policy was attached to the letter.[56]

Second, the government contends that the standard proffer agreement authorizes the disclosure of the proffer statements to the Court (and my reliance on them in imposing sentence). This is true, the government argues, even though Rivera had withdrawn the submission that had triggered the government's right to rely on those statements and the

---

[55]        Gov't Letter Br. at 4.
[56]        *Id.* at Ex. C.

government had expressly withdrawn its own overt reliance on them.[57]  In this regard, the government contends that, for the reasons set forth in preceding paragraph, it is required by law to notify the Probation Department and the Court of the proffer statements, and thus the disclosure of those statements is authorized by the proffer agreement.[58]

Finally, as for the role the incriminating proffer statements should play in the sentencing decision, the government contended that "the Court may review or consider such information as it believes appropriate, if at all."[59]

For his part, Rivera, once again represented by conflict-free counsel, contended that that the proffer statements should never have been brought to my attention, and that I must not rely on them in imposing sentence.

## DISCUSSION

A. *In the Absence of an Agreement to the Contrary, the Law Requires that Rivera's Proffer Statements be Withheld from the Sentencing Judge*

As indicated above, I conclude that the relevant authorities establish a general rule prohibiting the dissemination to the sentencing judge of proffer statements when there is no proffer agreement and no cooperation agreement is reached, except when the defendant himself relies in a misleading fashion on one or more of the statements.  Statements made during cooperation proffers are "made during plea discussions with" a prosecutor within the meaning of Fed. R. Evid. 410(a)(4).  In order to foster plea discussions, Rule 11(f) of the Criminal Rules and Rule 410 of the Rules of Evidence combine to prohibit the use of those statements at a trial.  For the same reason, the Commission imported that prohibition into the sentencing phase of a case.

---

[57] *See supra* Section H.
[58] *See* Gov't Letter Br. at 6.
[59] *Id.* at 7.

Specifically, in commentary that has the force of law,[60] the Commission contemplated the precise situation before me and stated that the use of the proffer statements at sentencing is "restricted" by Rule 410.[61]

The only plausible reading of that directive is that it prohibits the government from notifying the sentencing judge of the substance of a defendant's proffer statements. Rule 410 specifically denominates the use of proffer statements at trial as a "prohibited use" and identifies only one relevant "exception" where the defendant has used one or more of the statements in a misleading fashion.[62] Except in those narrow circumstances, and in order to encourage plea negotiations, Rule 410 prohibits exposing the decision-maker at trial to the substance of the defendant's proffer statements. The Commission's importation of that principle into the sentencing phase prohibits exposing the decision-maker in that setting to the substance of the proffer statements for precisely the same reason.

The policy argument in favor of such a rule is clear. Federal prosecutors depend heavily on cooperating witnesses to obtain convictions. In Fiscal Year 2013, 22 percent of sentenced defendants in this district received substantial assistance motions.[63] The median percentage of decrease in sentence from the Guidelines range minimum for defendants who received substantial assistance motions was fully 91 percent, reflecting the sentencing judges' view of the benefits of the cooperation.[64] But those reduced sentences are themselves the cost of the cooperation, that is, otherwise-deserved prison terms are either dramatically abbreviated or eliminated entirely. Proffer sessions play a critical role in the judgment calls the government

---

[60]    *See Stinson v. United States*, 508 U.S. 36, 42-43 (1993).
[61]    *See* U.S.S.G. § 1B1.8, cmt. n.3, which is quoted at page 7, *supra*.
[62]    The rule is quoted in full at note 11, *supra*. The other exception is when the defendant is being prosecuted for perjury or false statements.
[63]    *See* Table 30, *USSG Interactive Sourcebook*, http://isb.ussc.gov.
[64]    *See id.*

must make in recruiting accomplice witnesses; without a full flow of information from the would-be cooperator, the prosecutor cannot make the rational assessment of the prospective costs and benefits of signing a defendant up to a cooperation agreement.[65]

This case makes it easy to see why a promise to withhold the proffer statements from the sentencing judge might be necessary to induce a defendant to proffer. Had Rivera been told up front that everything he would say during the proffer sessions would be shared with his sentencing judge even if he did not receive a cooperation agreement and a substantial assistance motion, he would certainly have hesitated to proffer at all, or may have proffered but not disclosed his violent criminal past. Neither of those outcomes would serve the important law enforcement interest in fostering cooperation.

There are obvious downsides to a rule that deprives a sentencing judge of important, relevant information about the defendant, and I have expressed them both in this case and elsewhere.[66] A separate cost is incurred whenever a judge sentences a defendant while deprived of information that bears directly on his blameworthiness. In this case, for example, the sentence I imposed on Rivera was significantly more lenient than the sentence I would have imposed if I could properly consider his proffer statements. His 102-month sentence does not reflect the seriousness of his relevant criminal conduct, and I also may be endangering the community to which he will be released too soon.

Still, several factors mitigate that cost. First, if a defendant's proffer statements reveal criminal activity for which he ought to prosecuted and punished, the government is free to use those statements to commence an investigation and prosecution. Unlike the sentence I would

---

[65] *See Wade v. United States*, 504 U.S. 181, 187 (1992) ("The Government's decision not to move [for substantial assistance under § 5K1.1] may have been based not on a failure to acknowledge or appreciate Wade's help, but simply on its rational assessment of the cost and benefit that would flow from moving.").

[66] *See* Tr. (Jan. 30, 2015) at 4-5; *see also United States v. Doe*, No. 96-cr-749(JG), 1999 WL 243627, at *9-11 (E.D.N.Y. 1999).

have imposed on Rivera had he cooperated, the sentence I imposed did not satisfy his criminal liability for the violent crimes he disclosed while proffering. And the protection afforded by Rule 410 has never included the derivative use of proffer statements. Thus, the government is free, for example, to track down the person who, at Rivera's instruction, paid $1,000 to have a courier killed, and to build that murder case against Rivera.

In addition, much of the potential unseemliness in having a sentencing judge remain partly in the dark can be ameliorated by agreement, and indeed the government has demonstrated that ability here. It would be perverse indeed if I were to sentence Rivera based on his former counsel's passionate assertions that he is a "first offender" and "the public does need any protection from him,"[67] after Rivera himself had admitted a long history of intense criminal conduct, including violent conduct from which the public indeed needs protection. But that concern can be blunted by contract, as it has been here. The standard agreement prevents the defendant from taking unfair advantage of the protections afforded by law to proffering defendants by allowing the government to use the proffer statements to rebut such misleading contentions at sentencing.

Accordingly, I conclude that the law is clear: when a would-be cooperating defendant proffers in the absence of any proffer agreement and no cooperation agreement results, the relevant rules and Guidelines provisions require that the proffer statements be withheld from the sentencing judge. The rule is firmly grounded in the policy of encouraging plea discussions generally, and cooperation bargaining specifically.

The fulcrum of the government's contrary argument is 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States

---

[67] Rivera Sentencing Letter (May 26, 2014) at 5.

may receive and consider for the purpose of imposing an appropriate sentence." As the Commission observed in the very first Guidelines Manual, the recodification of § 3661 in 1984 made "it clear that Congress intended that no limitation would be placed on the information that a court may consider in imposing an appropriate sentence under the future guideline sentencing system. A court is not precluded from considering information that the guidelines do not take into account."[68] The Supreme Court as well as observed that the history of § 3661 confirms that it was enacted to ensure that a sentencing judge should not be limited in the type or form of information she may consider at sentencing.[69] As discussed further below, it cannot be true that because a sentencing judge may consider any information, she must be notified of the information that the parties have agreed should be kept out.

The government mines from § 3661's general rule that sentencing judges are not restricted in considering the information before them in imposing sentence a statutory directive that all information relevant to a defendant's sentencing *must* be provided to the sentencing judge. This mandatory disclosure rule, the government further argues, admits of no exceptions, and requires the government to provide incriminating proffer statements to the sentencing judges in all circumstances, including Rivera's.

The government's claim that it feels bound by statute to provide all relevant sentencing information to the sentencing judge in every case cannot be squared with what actually happens every day in federal courtrooms. Throughout the almost 30-year history of Guidelines sentencing, prosecutors have influenced Guidelines range computations to suit their

---

[68]     U.S.S.G. § 1B1.4, cmt.
[69]     *See United States v. Watts*, 519 U.S. 148, 151 (1997) (per curiam) (explaining that § 3661 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information"). In *Pepper v. United States*, the Supreme Court again emphasized that the point of § 3661 is to preserve the discretion of sentencing judges in the type or source of information they may consider at sentencing. *See* 562 U.S. 476, 489 (2011) (Sotomayor, J.).

purposes by withholding facts from probation officers and judges.[70]  As the First Circuit has observed, prosecutors "fact bargain," a process that includes both "affirmative misrepresentations to a court" and "not fully disclos[ing] the facts" of the crime.[71]  The government convinced that court that the "unduly lenient" sentences that result when the government does not fully disclose the facts to the sentencing judge are "the inevitable artifacts and consequences of plea bargains," and are of no concern to the court.[72]  The government's willingness to tinker with facts in an effort to procure guilty pleas has become so common that it is no longer even considered notable.  Consider for example the recent Second Circuit opinion agreeing with the government's argument that it had given good consideration for a defendant's waiver of his right to appeal:

> Nor is there any merit to Coston's claim that he received no consideration for the waiver of his appellate rights: as the [presentence report's] findings about the actual loss caused by Coston's conduct suggest, and as the government confirms on appeal, in the plea agreement the government stipulated to a much lower loss amount that was actually involved in the offense of conviction, and, moreover, stood by that stipulation in the sentencing memorandum it submitted to the district court in advance of sentencing.[73]

---

[70]     *See* Kate Stith & Jose A. Cabranes, *Judging Under the Federal Sentencing Guidelines*, 91 Nw. U. L. Rev. 1247, 1260 (1997) ("[P]rosecutors have an incentive not to be forthcoming with the probation officer when the defendant's agreement to plead guilty has been tendered with the expectation that certain allegations or certain facts will not be considered in the calculation of the sentence."); Letter of Francesca D. Bowman, Chair, First Circuit, Probation Officers Advisory Group, to Richard P. Conaboy, Chairman, United States Sentencing Commission (Jan. 30, 1996) at 1-2 (highlighting prosecutors' power and incentives, in some cases, to withhold facts from probation officers); *see also United States v. Booker*, 543 U.S. 220, 290 (2005) (Stevens, J., dissenting, joined by Scalia, and Souter, JJ.) ("Not only is fact bargaining quite common under the current system, it is also clear that prosecutors have substantial bargaining power."); *United States v. Ring*, 811 F. Supp. 2d 359, 369-71 (D.D.C. 2011) (discussing the limits on the government's ability to engage in "fact bargaining"); *see generally* Stephen J. Schulhofer & Ilene H. Nagel, *Plea Negotiations Under the Federal Sentencing Guidelines: Guideline Circumvention and its Dynamics in the Post–Mistretta Period*, 91 Nw. U. L. Rev. 1284 (Summer 1997); Frank O. Bowman, III, *To Tell the Truth: the Problem of Prosecutorial Manipulation of Sentencing Facts*, 8 Fed. Sent. R. 324 (May/June 1996).

[71]     *United States v. Yeje-Cabrera*, 430 F.3d 1, 23-24, & n.17 (1st Cir. 2005).

[72]     *Id.* at 23-24.

[73]     *United States v. Coston*, 737 F.3d 235, 237 (2d Cir. 2013).

Against this extensive backdrop of withholding (and sometimes even misrepresenting) facts, the government's current insistence that it feels required by statute to tell judges all facts relevant to all sentences is difficult to take seriously.

As for the merits of the government's reliance on § 3661, on its face the time-honored general rule that judges can consider all information properly before them in determining sentence cannot be read to mandate that all relevant information must be provided to the court. The Commission certainly doesn't see it that way, as it reiterates the terms of § 3661 in § 1B1.4 of the Guidelines, but, as discussed above, in the commentary to § 1B1.8, it directs the withholding of proffer statements where no cooperation agreement is reached. The government apparently doesn't see it that way either, as the United States Attorney's Manual expressly forbids the disclosure of a defendant's immunized testimony to the sentencing judge without the defendant's permission.[74] And it's hard to imagine that if the government inadvertently intercepted a privileged but incriminating statement by a defendant, it would feel compelled by § 3661 to share that statement with the sentencing judge.

In sum, I reject the government's claim. In my view, § 3661 is not a disclosure mandate at all, let alone one that admits of no exceptions. Moreover, as the above discussion suggests, there are multiple sound policy reasons why information that has a significant bearing on a defendant's actual culpability may properly be withheld from a sentencing judge. Fostering the cooperation of defendants in criminal investigations is one of them. The government was not required by law to disclose Rivera's proffer statements to me, directly in its sentencing

---

[74]     U.S. Dep't of Justice, *Criminal Resource Manual*, § 725, *available at* www.justice.gov/usam, ("If the witness for whom immunity has been authorized is awaiting sentencing, the prosecutor should ensure that the substance of the witness's compelled testimony is not disclosed to the sentencing judge unless the witness indicates that he or she does not object. This is intended to avoid a claim by the witness that his or her sentence was adversely influenced by the immunized testimony."). I doubt the government would attempt to accomplish with immunized testimony what it seeks to accomplish here, that is, agree not to overtly mention it but nonetheless "notify" me (by having the Probation Department deliver the transcript) to use as I see fit.

submission or indirectly through the Probation Department.  To the contrary, in the absence of an

enforceable agreement providing otherwise, it was prohibited by law from doing so.

Accordingly, to the extent the district policy regarding proffer-protected statements is followed

where there is neither a proffer agreement nor a cooperation agreement, I conclude that it

violates the defendant's rights in every case.

B.      *Neither the Proffer Agreement Nor the District Policy Permitted the Disclosure of the Proffer Statements*

As discussed above, one of the possible justifications for my consideration of

Rivera's proffer statements at his sentencing fell by the wayside.  Specifically, the ill-advised

application by prior counsel for safety valve relief indisputably triggered the government's right

under the proffer agreement to overtly rely on the proffer statements at sentencing.  The filing of

the safety valve motion clearly amounted to ineffective assistance of counsel, however, and the

government has never contended otherwise.  Accordingly, the government no longer relies on

that justification.  On consent, the motion was withdrawn, as was the government's reliance on it

as a basis for my awareness and consideration of the proffer statements.[75]

As explained in the preceding section, the belief that disclosure was required by

law was wrong; the opposite was true.  However, the government is free to argue that under the

terms of proffer agreement, its *belief* regarding the applicable law was enough to trigger its right

under the agreement to disseminate the proffer statements, even if, as it has turned out, that belief

was incorrect.  Indeed, in the closely related context of cooperation agreements, a prosecutor can

---

[75]      Because Rivera consented to the imposition of sentence by me, I did not need to decide whether he was entitled to a reassignment of the case to another judge who would be unaware of the proffer statements.  *Cf. United States v. Enriquez*, 42 F.3d 769, 772 (2d Cir. 1994) (remedy for prosecutor's breach of promise not to contest a downward adjustment in Guidelines range calculation was resentencing before a different judge).

withhold a substantial assistance motion based on an incorrect and even unreasonable belief that such assistance was not provided, as long as the belief is honestly held.[76]

The government's only remaining argument based on the proffer agreement centers on the provision stating that "the Office will, to the extent it believes it is required by law, notify the Probation Department and the Court in connection with sentencing of any statements made by [Rivera] at the Meeting."[77] The government has supported its disclosure of the proffer statements to me, and its claim that I may rely on them in imposing sentence, by asserting that it believed it was required by law to make the disclosure; the district policy is the mechanism by which it was made. For two reasons I reject the argument that a fair reading of the terms of the proffer agreement leads a defendant to believe that, except in four very clear circumstances,[78] the proffer statements will not be disclosed to the sentencing judge. The prosecutor has admitted that Rivera and his counsel were told only that the proffer statements *may* be disclosed to the Court, a message that the prosecutor admits flows directly from the conditional promise in the proffer agreement *not* to disclose them.[79] It's difficult to square that conduct with a good-faith belief that disclosure is required by law in every case. As discussed in the preceding section, the government routinely withholds facts relevant to sentencing.

Second, contracts in the criminal setting are special. As a result, they are construed strictly against the government, and ambiguities in them are resolved against the

---

[76] *See United States v. Rexach*, 896 F.2d 710, 713-14 (2d Cir. 1990); *see also United States v. Knights*, 968 F.2d 1483, 1486-87 (2d Cir. 1992).

[77] Gov't Letter Br., Ex. A ¶ 2 (emphasis added).

[78] *See supra* page 10.

[79] The assigned AUSA conceded last week that Rivera and his counsel were told, orally and in the very terms of the proffer agreement, that Rivera's proffer statements "*may* be provided to the sentencing court," notwithstanding the fact that the undisclosed district policy requires such disclosure. Tr. (June 2, 2015) at 10-11 (emphasis added).

government.[80]   In paragraph two of the agreement, the government promised not to disclose the proffer statements at sentencing.  The next sentence conveyed the caveat that it would nevertheless disclose the statements if it believed it was required by law to do so.  Rivera had every right to believe that the serious consequences that could flow from that disclosure would occur only if the government lawyer's belief were correct.  If the government wants to bind proffering defendants to its good faith *but erroneous* beliefs about the state of the law, it can do so expressly, as it does with regard to its assessments of a cooperating defendant's substantial assistance.[81]

The government claims that to the extent the proffer agreement includes a promise to withhold Rivera's proffer statements from the Court, such a promise is unenforceable because it is contrary to public policy as expressed by the Second Circuit.  One wonders both why the government executed such an agreement with Rivera if it actually believes it was contrary to public policy to do so, and why it continues to execute substantially identical agreements with proffering defendants to this day.  In any event, the argument has been advanced, and it relies on superficially supportive language in Second Circuit cases.

The short answer to that argument is that the cases are easily distinguishable.  For example, *United States v. Williamsburg Check Cashing Corp.* holds only that a prosecutor's promise not to make a recommendation about a sentence cannot prohibit the prosecutor, through the case agents, from providing factual information about the defendant to the Probation

---

[80]    *See United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996), *superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013); *United States v. Miller*, 993 F.2d 16, 20 (2d Cir. 1993); *see also United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999) (prosecutors are held "to the most meticulous standards of both promise and performance") (internal quotation marks omitted); *United States v. Podde*, 105 F.3d 813, 821 (2d Cir. 1997) (declining to find waiver of statute of limitations in "plea bargain that is to be strictly construed against the government").

[81]    *See United States v. Brechner*, 99 F.3d 96, 98 (2d Cir. 1996) (citing language from the cooperation agreement signed by the defendant where the agreement provided that, "in connection with the sentencing departure, 'it is understood that the [U.S. Attorney's] Office's assessment of the value, truthfulness, completeness, and accuracy of the cooperation shall be binding upon [Brechner].'") (alterations in original).

Department. The court held that the government "may still provide the Probation Department with any factual material relevant to sentencing," even when the government agreed it would not make a sentencing recommendation.[82] *Williamsburg Check Cashing* did not concern a proffer agreement or Application Note 3 to § 1B1.8, and it certainly did not read a mandate into § 3661 that the government must provide the court with all factual information about the defendant. And while the government asserts that *United States v. Fagge* concerned "whether the government had breached a proffer agreement,"[83] in fact the proffer agreement in that case was extinguished by a superseding plea agreement,[84] whereas in this case, the plea agreement expressly preserved the promises made in the proffer agreement. Moreover, the actual holdings of those cases rested upon conclusions that the terms of the controlling agreements specifically permitted the government to engage in challenged conduct.[85]

That said, those cases indeed contain *dicta* suggesting that any agreement to withhold from the sentencing court information pertinent to sentencing would violate public policy.[86] But I'm not persuaded that such language, which was not necessary to the decisions of the court, reaches as far as the government contends it does. None of those cases even begin to address the important public policy interests that are served by fostering cooperation, or the degree to which the conditional promise set forth in the standard proffer agreement serves those interests. Finally, if public policy prohibits the Department of Justice from depriving judges of proffer statements by agreement, it seems clear that it would also prohibit the Commission from

---

[82] 905 F.2d 25, 28 (2d Cir. 1990).

[83] *See* Gov't Br. at 3.

[84] 101 F.3d 232, 233-34 (2d Cir. 1996).

[85] The same is true with respect to *United States v. Lovaglia*, where the court held that the government's provision to the sentencing court of information about overt acts that were not specifically admitted by the defendants did not violate the plea agreement. 954 F.2d 811, 817-18 (2d Cir. 1992).

[86] *See Williamsburg Check Cashing*, 905 F.2d at 28 ("Such an agreement to keep the judge ignorant of pertinent information cannot be enforceable, because a sentencing court 'must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed.'") (quoting *Wasman v. United States*, 468 U.S. 559, 563 (1984)).

accomplishing that same result by the directive set forth in Application Note 3 to U.S.S.G. § 1B1.8. No binding circuit precedent requires either result, and for all the reasons set forth above I reject the invitation to reach it here.

The foregoing implies no criticism of the very able AUSA in this case. He was following a formal district policy that was the product of discussions between his office and the Probation Department. And though I believe that policy violates the protection afforded to proffering defendants by the Commission, that protection is set forth somewhat obscurely, in an application note to a guideline (§ 1B1.8) that is not applicable to Rivera's case.[87] However, the district policy, which is quoted in full above, was not disclosed to Rivera before his proffers, and indeed it wasn't even in existence at the time. For all the reasons discussed above, I hold that the disclosure of his proffer statements pursuant to that policy violated the limited protection from disclosure afforded by the proffer agreement.

C.      *Suggestions for Changes*

Implicit in both the government's approach to this issue and in the district policy is an important misconception. The misconception is that there is a meaningful distinction between the government's overt reliance on proffer statements at sentencing on the one hand, and its mere provision of the statements to the Court for it to consider or not (as it sees fit) on the other. In the former situation, the government contends, the proffer statements go into the presentence report, the advisory Guidelines range is life, and the prosecutor can mention them at sentencing. In the latter, the argument continues, the statements are restricted to a sealed, off-the-record memorandum, the Guidelines range is computed separately and is 108-135 months,

---

[87]      Section 1B1.8 allows the government and a defendant to agree that certain information provided by the defendant not be considered in determining the applicable Guidelines range. No such agreement was reached in this case.

and the prosecutor will not mention the incriminating information admitted by Rivera at sentencing.

Though I address a more important concern in a moment, a central premise of the government's position is wrong. In the absence of an agreement under U.S.S.G. § 1B1.8, which does not exist here, once relevant conduct is brought to the attention of the Probation Department and the Court, that conduct must be included in the calculation of the advisory Guidelines range. I know of no provision in the Guidelines or statutes that permits me to do otherwise, and the government does not contend that one exists.[88]

More importantly, once a judge who sentences someone in Rivera's position is made aware of the defendant's violent criminal activity and informed that it may be considered in imposing sentence, it is cold comfort to the defendant that the prosecutor will choose to remain silent about that activity at the sentencing. Rivera still faced up to 40 years in prison, and after *Booker v. United States*,[89] a sentencing judge who considers the proffer statements may reasonably impose a sentence of that length no matter what the Guidelines range is. The policy explicitly contemplates that the proffer statements may "serve as a reason for a variance/departure from the Sentencing Guidelines."[90] There's no reason to expect that a sentencing judge will disregard the fact that a defendant is a murderer simply because the prosecutor chooses not to mention it.

It is true that Rivera could hope that the judge might choose to ignore the sealed submission setting forth the proffer statements. That would make matters better for him, but

---

[88]     *See also The Pretrial Investigation Report, supra* note 33, at I-2 ("Officers appearing in court should maintain their independence, and avoid the appearance of favoring one party over another. While *in camera* discussions with the court are encouraged, *officers should not use that time to provide factual information to the judge that was otherwise excluded from the report* (unless the information was excluded pursuant to the Federal Rules of Criminal Procedure).") (emphasis added).
[89]     543 U.S. 220 (2005).
[90]     The policy is quoted in full at *supra* pages 15-16.

from my perspective that makes the policy even worse. By providing incriminating information off the record to the sentencing judge and allowing him or her to "review or ignore it as [he or she] sees fit," the policy subjects proffering defendants to a game of chance (will the judge review it or ignore it?), and they may never even know if they won or lost the game. Did the judge refuse to sentence below the advisory range because she chose not to ignore the sealed envelope? Or did she believe the sentence imposed was warranted even if the proffer statements were ignored? The policy reintroduces the sort of opacity that sentencing reform was intended to eliminate.[91] And since some judges presumably consider the incriminating proffers and others do not, the policy also risks producing the sort of unwarranted disparities in sentencing that the same reform movement sought to eliminate.

Finally, the policy puts defense counsel in an untenable position at sentencing. If the case agent erred to the defendant's disadvantage in describing the proffer statements, should defense counsel provide the correct version of those statements to the court? If one or more of the crimes admitted at the proffer is mitigated by extenuating circumstances or other facts not set forth in the sealed memorandum, should counsel make the mitigation argument? If the sentencing judge is a "reviewer," the answer to those questions is easy. If she is an "ignorer," it seems equally easy in the other direction. But there's no mechanism for counsel to know which course to follow. Judges are not required to disclose whether they reviewed the proffer statements. Defense counsel could try to clarify things by asking the judge at sentencing whether she reviewed the sealed memorandum, but that runs the risk of drawing the court's attention to the incriminating material for the first time. In short, by providing damaging information about

---

[91]     The government itself places this problem in clear relief by saying, as though it is an advantage to defendants, that it will not use the proffer statements at a *Fatico* hearing. *See* Gov't Reply Br., dated Jan. 23, 2015, at 4, ECF No. 30. But *Fatico* hearings are at least adversary in nature, and the defendant has the opportunity to challenge the information that may increase his sentence. When the proffer statements come through the back door, for judges to consider or not as they see fit, they cannot be challenged at all.

the defendant to the sentencing judge for her to consider or not as she sees fit, the policy forces the lawyers for at least some proffering defendants to advocate in the dark.

I think it is clear that the government has the power to require all defendants who wish to cooperate to agree that the sentencing judge will be informed of the defendant's proffer statements even if no cooperation agreement is reached.[92]  It is also clear that the government is in the best position to know whether such a requirement would discourage too many proffers, and whether the law enforcement interests impaired by the requirement would outweigh the interest in informing judges of the proffer statements, in which case it will choose to continue providing limited "proffer protection."  I respectfully suggest that whatever course the government chooses, it makes the choice clearly and discloses it fully to proffering defendants and their counsel.  Most importantly, there needs to be a single, transparent track of information to the sentencing judge.  Proffer statements should either be in the sentencing mix (potentially subject to a § 1B1.8 agreement) or out of it entirely.

As for the district policy, the discussion above obviously reflects my respectful view that it at least needs to be changed.  A clearer understanding of the applicable law, combined with a clearer proffer agreement, would eliminate the need for the policy entirely.  If not, I further suggest to the Probation Department that any revisions to the policy include discussions not only with the United States Attorney, but also with the appropriate representatives of the defender community.

## CONCLUSION

For the foregoing reasons, I decided not to consider in any way the proffer statements made by Rivera.  The 102-month sentence I imposed ignored entirely the criminal activity disclosed by Rivera in his attempt to cooperate.

---

[92]     *See Velez*, 354 F.3d at 194 -97.

So ordered.


John Gleeson, U.S.D.J.

Dated: June 24, 2015
       Brooklyn, New York